UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------X

GREGORY GALBERTH,

                                    Plaintiff,

                    v.

CAPTAIN WASHINGTON, *et al.*,

                                    Defendants.

---------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: March 29, 2016

14 Civ. 691 (KPF)

OPINION AND ORDER

KATHERINE POLK FAILLA, District Judge:

On January 27, 2014, Plaintiff Gregory Galberth initiated this action against employees of two different correctional facilities in this District, Rikers Island and Downstate Correctional Facility.  Initially, Plaintiff identified these employees in his complaint (the "Complaint") as "Captain Washington," "Ms. Hurnst," and various John and Jane Does.[1]  After this Court issued an order pursuant to *Valentin* v. *Dinkins*, 121 F.3d 72 (2d Cir. 1997) (per curiam), the New York City Law Department (the "Law Department") sent Plaintiff additional information about the individuals involved in his case; in response to that information, Plaintiff filed an amended complaint (the "Amended Complaint") that added "C.O. Soto" and the City of New York as defendants.  In brief, the Amended Complaint alleges that the defendants showed deliberate indifference

---

[1]  Plaintiff did not list Ms. Hurnst in the caption of the Complaint, but the body of the Complaint referred to Ms. Hurnst as "Defendant No. 7" and contained allegations that she had violated Plaintiff's rights.  (Dkt. #2 at 9-10).  For the individual defendants who have been identified, no first name has been provided to the Court.

to Plaintiff's medical needs and/or used excessive force against him.  On August 24, 2015, Defendants Washington and the City of New York (collectively, "Defendants") moved to dismiss many of Plaintiff's claims.[2]  For the reasons that follow, Defendants' motion is granted in part and denied in part.

**BACKGROUND**[3]

**A.    Factual Background**

The metes and bounds of Plaintiff's Amended Complaint are not entirely clear.  Taking its cues from Defendants' recitation of the facts, which Plaintiff indicates is correct (*see* Pl. First Opp. 25), the Court understands Plaintiff to be alleging that various individuals committed misconduct at Rikers Island and at Downstate Correctional Facility, as detailed in the remainder of this section.

**1.    Plaintiff's Rikers Island Claims**

**a.    The Deliberate Indifference Claims**

According to the Amended Complaint, a number of individuals working at the constituent facilities on Rikers Island were deliberately indifferent to

---

[2]    The other defendants have neither been served nor appeared in this matter.

[3]    The facts contained in this Opinion are drawn from the Amended Complaint ("Am. Compl.") (Dkt. #45), as well as the declaration of Daniel H. Oliner ("Oliner Decl.") (Dkt. #84), and are taken as true for purposes of the pending motion.  *Faber* v. *Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011) (when reviewing a complaint for failure to state a claim, the court will "assume all well-pleaded factual allegations to be true" (internal quotation marks omitted)). For convenience, the Court will refer to Defendants' opening brief as "Def. Br." (Dkt. #85); Plaintiff's first opposition brief as "Pl. First Opp." (Dkt. #89); Plaintiff's second opposition brief as "Pl. Second Opp." (Dkt. #90); Defendants' reply brief as "Def. Reply" (Dkt. #93); Plaintiff's sur-reply as "Pl. Sur." (Dkt. #98); and Defendants' sur-sur-reply as "Def. Sur." (Dkt. #102).  In addition, when the Court cites a particular page in one of Plaintiff's submissions, it is citing to the page numbers assigned by the Court's electronic case filing (or "ECF") system.

Plaintiff's need for mental health treatment, in violation of his Eighth Amendment rights.  Plaintiff alleges that, on April 8 or 9, 2011, he arrived at the Anna M. Kross Detention Center, and was subsequently assigned to Unit C-74.  (Am. Compl. 2).  After his arrival, Plaintiff claims, he "asked to see mental health [professionals] but was ignored by many shift officers."  (*Id.* at 3).  Plaintiff states that he specifically requested help from the "B officer"[4] and "Captain Washington" as they walked by his cell, but neither took him to see a mental health provider.  (*Id.*).

Plaintiff alleges that, after this incident, he tried to hang himself, and the "B officer" went over to his cell to ask what he was doing.  (Am. Compl. 3).  Plaintiff once again explained that he needed mental health care, and in response, the "B officer" swore at him and said: "I do what I want."  (*Id.*).

Following his conversation with the "B officer," Plaintiff allegedly waited several hours on the floor for an escort officer to take him over to the "bull pen[]."  (Am. Compl. 8-9).  While Plaintiff was being escorted to the "bull pen[]," he encountered Captain Washington in the hallway, and tried to explain what had happened earlier in the day.  (*Id.* at 9).  Captain Washington allegedly told Plaintiff that no one had called her about the situation.  (*Id.*).

Once in the "bull pen[]," Plaintiff waited overnight with no bed and no pillow.  (Am. Compl. 9).  In the morning, Plaintiff was taken to a "mental

---

[4]     The Court understands that housing units at Rikers Island are divided into "A" and "B" sides, with one correction officer assigned to each side.  *See, e.g.*, *Garcia* v. *John Doe No. 1 Hous. Officer*, No. 13 Civ. 557 (VB), 2014 WL 3887861, at *1 (S.D.N.Y. June 19, 2014).

observation trailer," where he saw a "doctor for mental health." (*Id.*).  This doctor assigned Plaintiff to Unit C-73, which Plaintiff identifies as a "mental health unit" located within the George Motchan Detention Center, another facility at Rikers Island. (*Id.* at 9-10).

While Plaintiff was in C-73, he met "psychologist Ms. Hurnst," and explained to her "the fear and the abuse" he had experienced in C-74. (Am. Compl. 10).  Plaintiff allegedly told Ms. Hurnst that he was "afraid to go back" to C-74. (*Id.*).  In addition, Defendant told Ms. Hurnst that he had previously been mistreated at Clinton Correctional Facility, and was afraid that if he went back to that facility, corrections officers would retaliate against him. (*Id.*).[5] Nevertheless, according to Plaintiff, the staff at C-73 asked him to "get on [a] bus to . . . Clinton." (*Id.*).  Before getting on the bus, Plaintiff says he "tried to swallow Clorox," and a sergeant was called. (*Id.* at 10-11).  The sergeant told an "escorting officer" to restrain Plaintiff and transport him upstate. (*Id.*).

### b.    The Excessive Force Claims

Plaintiff also alleges that, while he was waiting at the Anna M. Kross Center, the "B officer" told him to step out of his cell and kneel. (Am. Compl. 8).  When Plaintiff complied, the "B officer" allegedly "started stomping

---

[5]     While the Amended Complaint alleges that prison staff at both Rikers Island and Downstate Correctional Facility failed to prevent Plaintiff's transfer to Clinton Correctional Facility, the Court does not believe that the Amended Complaint brings any claims against Clinton personnel. (*See* Am. Compl. 2 (explaining that the events giving rise to Plaintiff's claims took place on Rikers Island and at Downstate Correctional Facility)).  As a result, the Court will only address the events that occurred on Rikers Island and at Downstate Correctional Facility.

[on] both [of Plaintiff's] legs." (*Id.*).  Then, the "B officer … squeezed [Plaintiff's] fingers together as he walked [Plaintiff] down the hallway." (*Id.*).

In addition, Plaintiff alleges that while he was leaving C-73, the "escorting officer" threw him "up against a wall" and "put these plastic cuffs on." (Am. Compl. 11).  Plaintiff claims that the cuffs were so tight they "cut[] [his] blood circulation off." (*Id.* at 12).  He also alleges that the officers who transported him off of Rikers Island, including C.O. Soto, used "double[] restraints," which caused Plaintiff's legs and hands to swell.  (*Id.* at 12-13).

## 2. Plaintiff's Downstate Correctional Facility Claims

### a. The Deliberate Indifference Claim

Plaintiff claims that, while he was at the Downstate Correctional Facility in April 2011, he "explain[ed] to psychologist Ms. Green" that he had been harassed and threatened while he was incarcerated at Clinton Correctional Facility.  (Am. Compl. 11; *see also* Pl. First Opp. 16 (correcting date on Amended Complaint to make clear that Plaintiff saw mental health personnel at Downstate in April 2011)).  Nevertheless, Plaintiff alleges that Ms. Green "still put [him] on [an] upstate bus" and would "not help … protect [him] from these bad officials [at] Clinton." (Am. Compl. 12).  In addition, Plaintiff alleges that Ms. Green "refused to give [him] the proper treatment" for his mental illness because she was "working with the corrupt administration." (*Id.* at 15).

### b. The Excessive Force Claim

Plaintiff alleges that he was brought into Downstate "strap[p]ed and chain[ed] down like [an] animal." (Am. Compl. 14).  He said that such severe

restraints were not necessary because he did not "fight … nor struggle with the transportation officer."  (*Id.*).

### 3.   Plaintiff's *Monell* Claim

Finally, Plaintiff alleges that the City of New York is liable for any violations of his constitutional rights because it failed to "train" or "supervise" its employees on Rikers Island, and this failure to train or supervise contributed to "deliberate indifference" to his health and safety. (Am. Compl. 19).  *See generally Monell* v. *Dep't of Soc. Servs. of the City of New York,* 436 U.S. 658, 691 (1978) (discussing circumstances under which municipal entity can be liable under 42 U.S.C. § 1983).

## B.   Procedural Background

Plaintiff initiated this action on January 27, 2014.  (Dkt. #2). Nevertheless, Plaintiff did not complete the necessary paperwork to serve the named defendants.  (*See* Dkt. #8).  Consequently, on April 25, 2014, this Court ordered Plaintiff to show cause, by May 9, 2014, why the case should not be dismissed for failure to prosecute.  (*Id.*).  Because Plaintiff did not provide an explanation for his inaction, the Court dismissed his suit without prejudice on May 12, 2014.  (Dkt. #12).

By letter dated May 19, 2014, Plaintiff asked the Court to re-open his case.  (Dkt. #16).  Plaintiff explained that he had not received the paperwork necessary to effect service because he had been housed in the mental health unit and then an outside hospital.  (*Id.*).  As a result, the Court re-opened the case on June 2, 2014.  (Dkt. #17).

On November 4, 2014, Plaintiff filed his Amended Complaint.  (Dkt. #45).
As of the date of this Opinion, Captain Washington and the City of New York
are the only defendants who have been served.  On August 24, 2015,
Defendants filed the instant motion to dismiss.  (Dkt. #82).  Plaintiff filed
several different sets of papers opposing the motion (Dkt. #89-90, 92, 98), and
Defendants were given an opportunity to respond to all of these papers (*see*
Dkt. #100).  Briefing on this matter closed on December 4, 2015, when
Defendants filed their sur-sur-reply.  (Dkt. #102).

## DISCUSSION

**A.    Applicable Law**

**1.    Motions to Dismiss for Failure to State a Claim**

When a court considers a motion to dismiss under Federal Rule of Civil
Procedure 12(b)(6), it must "draw all reasonable inferences in Plaintiff['s] favor,
assume all well-pleaded factual allegations to be true, and determine whether
they plausibly give rise to an entitlement to relief."  *Faber* v. *Metro. Life Ins. Co.*,
648 F.3d 98, 104 (2d Cir. 2011) (internal quotation marks omitted) (quoting
*Selevan* v. *N.Y. Thruway Auth.*, 584 F.3d 82, 88 (2d Cir. 2009)).  A plaintiff will
survive a motion to dismiss if he alleges "enough facts to state a claim to relief
that is plausible on its face."  *Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 569
(2007); *see also In re Elevator Antitrust Litig.*, 502 F.3d 47, 50 (2d Cir. 2007)
("[W]hile *Twombly* does not require heightened fact pleading of specifics, it does
require enough facts to nudge [a plaintiff's] claims across the line from
conceivable to plausible." (internal quotation marks omitted)).

7

The Court is not, however, bound to accept "conclusory allegations or legal conclusions masquerading as factual conclusions." *Rolon* v. *Hennenman*, 517 F.3d 140, 149 (2d Cir. 2008) (citation omitted); *accord Biro* v. *Conde Nast*, 807 F.3d 541, 544 (2d Cir. 2015); *see also Harris* v. *Mills*, 572 F.3d 66, 72 (2d Cir. 2009) ("[A]lthough a court must accept as true all of the allegations contained in a complaint, that tenet is inapplicable to legal conclusions, and threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." (internal quotation marks omitted)).

The Court is mindful that, "when the plaintiff proceeds *pro se*, as in this case, a court is obliged to construe his pleadings liberally, particularly when they allege civil rights violations," and to interpret them as raising the strongest arguments they suggest. *McEachin* v. *McGuinnis*, 357 F.3d 197, 200 (2d Cir. 2004); *see also Tracy* v. *Freshwater*, 623 F.3d 90, 101 (2d Cir. 2010) ("It is well established that a court is ordinarily obligated to afford a special solicitude to *pro se* litigants." (collecting cases)). "That said, the liberal pleading standard accorded to pro se litigants is not without limits, and all normal rules of pleading are not absolutely suspended." *Hill* v. *City of New York*, No. 13 Civ. 8901 (KPF), 2015 WL 246359, at *2 (S.D.N.Y. Jan. 20, 2015) (internal quotation marks omitted).

## 2. The PLRA and Its Exhaustion Requirement

The Prison Litigation Reform Act (the "PLRA"), 42 U.S.C. § 1997e, provides that an inmate cannot bring a federal suit regarding "prison conditions" until the inmate has exhausted all "available" administrative

remedies.  *Id.* § 1997e(a).  Lawsuits regarding "prison conditions" include "all … suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong."  *Hill* v. *Curcione*, 657 F.3d 116, 124 (2d Cir. 2011) (quoting *Porter* v. *Nussle*, 534 U.S. 516, 532 (2002)).

In *Hemphill* v. *New York*, 380 F.3d 680 (2d Cir. 2004), the Second Circuit explained how a court should determine whether an inmate has satisfied the PLRA's exhaustion requirement.  At the outset, the court should decide whether the inmate's claims are covered by a prison grievance procedure, and whether the inmate has utilized that procedure.  *See id.* at 681-86.  If the inmate's claims were covered, but the inmate has neglected to file a grievance, the court must engage in a three-part inquiry.  *See id.* at 686.  First, the court must ask whether the grievance procedure was "in fact 'available' to the prisoner."  *Id.*  Second, the court must consider "whether the defendants may have forfeited the affirmative defense of non-exhaustion by failing to raise or preserve it, or whether the defendants' own actions inhibiting the inmate's exhaustion of remedies may estop one or more of the defendants from raising the plaintiff's failure to exhaust as a defense."  *Id.* (citations omitted).  Finally, "the court should consider whether 'special circumstances' have been plausibly alleged that justify 'the prisoner's failure to comply with administrative procedural requirements.'"  *Id.* (quoting *Giano* v. *Goord,* 380 F.3d 670, 676 (2d Cir. 2004)).

After *Hemphill*, the Supreme Court explained that, under the PLRA, an inmate cannot bring suit unless he or she has "proper[ly] exhaust[ed]" administrative remedies.  *Woodford* v. *Ngo*, 548 U.S. 81, 88 (2006).  "Proper exhaustion demands compliance with an agency's deadlines and other critical procedural rules because no adjudicative system can function effectively without imposing some orderly structure on the course of its proceedings."  *Id.* at 90-91.  Applying the "proper exhaustion" rule, the Court held that, when an inmate fails to comply with procedural rules for a prison grievance system, and this non-compliance prevents the inmate from obtaining administrative relief, the inmate cannot bring suit in federal court.  *See id.* at 93, 103.

The Second Circuit has not decided whether *Hemphill* — which allows an inmate to circumvent a prison grievance system in an extraordinary case — can be reconciled with the *Woodford* Court's admonition that "a prisoner *must* complete the administrative review process in accordance with the applicable procedural rules, including deadlines, *as a precondition to bringing suit* in federal court."  548 U.S. at 88 (emphasis added); *see Amador* v. *Andrews*, 655 F.3d 89, 102-03 (2d Cir. 2011) (declining to answer this question); *Ruggiero* v. *County of Orange,* 467 F.3d 170, 176 (2d Cir. 2006) (same).  However, this Court believes that it can.  As Justice Breyer noted in his *Woodford* concurrence, the *Woodford* Court was guided by principles of administrative law and habeas corpus law, and these principles are not entirely rigid. *Woodford*, 548 U.S. at 103-04 (Breyer, J., concurring).  Rather, both bodies of case law recognize that, in rare instances, it may be permissible for a federal

10

court to excuse a plaintiff's failure to comply with procedural rules and regulations. *Id.*

Furthermore, the *Woodford* Court sought to thwart any "deliberate strategy" to avoid a prison grievance system and bring a claim directly to federal court. *Woodford*, 548 U.S. at 88; *see also id.* at 95 ("A prisoner who does not want to participate in the prison grievance system will have little incentive to comply with the system's procedural rules unless noncompliance carries a sanction[.]"). Crucially, however, an inmate cannot utilize *Hemphill* as part of a "deliberate strategy" to catapult a dispute into federal court because *Hemphill* only excuses compliance with administrative procedures in situations that are beyond an inmate's control. More specifically, *Hemphill* excuses compliance with prison procedures when: (i) a prison affirmatively declines the "opportunity to correct [its] own error[]," *id.* at 94; or (ii) an inmate — through no fault of his own — is unable to bring a grievance. *See Hemphill*, 380 F.3d at 686. Thus, the animating concerns of *Woodford* are not present in the circumstances described in *Hemphill*. For these reasons, the Court believes that *Hemphill* remains good law, and will apply that decision to the facts of this case. *See, e.g.*, *Stevens* v. *City of New York*, No. 12 Civ. 1918 (JPO), 2012 WL 4948051, at *4-6 (S.D.N.Y. Oct. 11, 2012) (explaining why *Hemphill* remains good law after *Woodford*); *see also Smith* v. *City of New York*, No. 12 Civ. 3303 (CM), 2013 WL 5434144, at *9 (S.D.N.Y. Sept. 26, 2013) ("In the absence of a clear indication that *Hemphill* has been overruled, this Court has no choice but

11

to treat it as good law."); *Winston* v. *Woodward*, No. 05 Civ. 3385 (RJS), 2008 WL 2263191, at *6 (S.D.N.Y. May 30, 2008) (same).

## B.   Analysis

### 1.   The Court Will Not Dismiss Any of Plaintiff's Claims for Failure to Exhaust Administrative Remedies

"[I]nmates are not required to specially plead or demonstrate exhaustion." *Jones* v. *Bock,* 549 U.S. 199, 216 (2007).  Rather, failure to exhaust administrative remedies is an affirmative defense that should generally be asserted in an answer.  *See id.* at 212.  Nevertheless, a defendant may bring a Rule 12(b)(6) motion based on an inmate's failure to exhaust available remedies if "nonexhaustion is apparent from the face of the complaint."  *Roland* v. *Smith*, 907 F. Supp. 2d 385, 388 (S.D.N.Y. 2012); *see also McCoy* v. *Goord*, 255 F. Supp. 2d 233, 251 (S.D.N.Y. 2003).  Here, Defendants argue, "it is clear from the face of [the] Amended Complaint that [Plaintiff] has failed to exhaust" certain of his claims against Rikers Island personnel.  (Def. Br. 9).

Plaintiff's claims that Rikers Island staff members were deliberately indifferent to his medical needs, as well as his claims that Rikers Island staff used unnecessary restraints to transport him, were covered by the Rikers Island grievance procedure.  (*See generally* Oliner Decl., Ex. D (describing the grievance procedure)).[6]  Nevertheless, the Amended Complaint expressly states

---

[6]     By contrast, Plaintiff's claim that the "B officer" "stomp[ed]" on his legs (Am. Compl. 8); his claim that that same officer "squeezed [his] fingers together" (*id.*); and his claim that another officer threw him "up against a wall" (*id.* at 11) were not grievable.  (*See* Oliner Decl., Ex. D at 3 ("Inmate allegations of assault … by either staff or inmates are not grievable under the grievance mechanism.")).

that Plaintiff did not file a grievance against Defendants.[7]  Thus, the Court will apply the three-pronged *Hemphill* inquiry to determine whether this failure to file a grievance was excusable.

The face of the Amended Complaint suggests that administrative remedies were "available" in this case.  *Hemphill*, 380 F.3d at 686.  *Hemphill* provides that administrative remedies are "available" to a plaintiff if "a similarly situated individual of ordinary firmness [would] … deem[] them available."  380 F.3d at 688 (internal quotation marks omitted).  Plaintiff's Amended Complaint states that he did not file a grievance because he was "mental[ly] ill."  (Am. Compl. 4).  However, it does not mention anything else that would prevent a person of ordinary firmness in Plaintiff's situation from pursuing administrative remedies on Rikers Island.  Under these circumstances, the Court may presume that the only barrier to the Rikers Island grievance procedure was Plaintiff's illness.  *Cf., e.g.*, *Ghee* v. *Ramos*, No. 13 Civ. 632 (RWS), 2013 WL 7018543, at *1-2 (S.D.N.Y. Dec. 4, 2013) (explaining that, when a prisoner alleges that he has followed a few steps of the grievance process, a court may presume that the plaintiff has only followed those few steps).

Turning to the second *Hemphill* factor, Defendants have not waived any affirmative defense grounded in Plaintiff's failure to exhaust administrative

---

[7]     Plaintiff used a standard form for *pro se* litigants to file his Amended Complaint.  This form asked, in relevant part, whether Plaintiff had "file[d] a grievance in the jail, prison, or other correctional facility where [his] claim(s) arose."  (Am. Compl. 4).  In response to this question, Plaintiff answered "no."  (*Id.*).

13

remedies.  *Hemphill*, 380 F.3d at 686.  (*See* Def. Br. 10).  Nor has Plaintiff alleged any facts suggesting that Defendants have engaged in the sort of misconduct that would estop them from asserting a failure-to-exhaust argument.  *Cf. Ziemba* v. *Wezner*, 366 F.3d 161, 163 (2d Cir. 2004) (per curiam) (suggesting that corrections officers might be estopped from asserting a failure-to-exhaust argument because they allegedly took steps to keep the plaintiff from filing a grievance).

Nevertheless, the face of the Amended Complaint suggests that there may be "'special circumstances' justifying ... [P]laintiff's failure" to utilize the prison grievance system.  *Hemphill*, 380 F.3d at 689.  It is true that most of the cases regarding "special circumstances" have involved plaintiffs who act in accordance with a reasonable — though mistaken — interpretation of the regulations governing the grievance process.  *See Winston* v. *Woodward*, No. 05 Civ. 3385 (RJS), 2008 WL 2263191, at *10 (S.D.N.Y. May 30, 2008); *McDowall* v. *Metro. Corr. Ctr.*, No. 08 Civ. 8329 (BSJ), 2010 WL 649744, at *7 n.4 (S.D.N.Y. Feb. 22, 2010) (collecting cases).  However, the Second Circuit has explained that "special circumstances" include any circumstances that "understandably" prevent an inmate from complying with the prison grievance system.  *Giano*, 380 F.3d at 678.  It would be difficult to say that an inmate's failure to file a grievance is anything but "understandabl[e]" if it is caused by circumstances completely beyond the inmate's control, and those circumstances categorically prevent the inmate from exhausting administrative remedies.  *See Bennett* v. *James*, 737 F. Supp. 2d 219, 227 (S.D.N.Y. 2010),

14

*aff'd*, 441 F. App'x 816 (2d Cir. 2011) (summary order) (considering the possibility that an inmate's failure to file a grievance could be justified if the inmate were "physically or mentally unable to comply with the grievance process"); *Johnson* v. *N.Y.C. Dep't of Corr.*, No. 13 Civ. 6799 (CM), 2014 WL 2800753, at *6 (S.D.N.Y. June 16, 2014) (same); *cf. Hale* v. *Rao*, 768 F. Supp. 2d 367, 377 (N.D.N.Y. 2011) (suggesting that, from a practical perspective, the plaintiff's illiteracy and low IQ rendered a prison grievance procedure unavailable).

Here, Plaintiff says that he was unable to file a grievance because he was "mental[ly] ill" during the relevant time period. (Am. Compl. 4). The fact that Plaintiff suffers from mental illness is certainly something outside of his control. Thus, if Plaintiff's symptoms were severe enough that he was absolutely incapable of complying with the relevant grievance procedures, his illness would constitute a "special circumstance[]" that would excuse his failure to pursue administrative remedies. *Hemphill*, 380 F.3d at 689. To be sure, Plaintiff has not explained whether or how his symptoms rose to this level. At this point in the litigation, however, he is not required to do so. Rather, Plaintiff can survive a motion to dismiss by alleging that he failed to utilize the prison grievance procedure for reasons that *might* amount to special circumstances. *See Roland*, 907 F. Supp. 2d at 388 ("Dismissal under Rule 12(b)(6) for failure to exhaust is … appropriate only where nonexhaustion is

apparent from the face of the complaint.").  Plaintiff has cleared this low hurdle.[8]

This conclusion is consistent with the ruling of a sister court, which refused to dismiss a case that Plaintiff filed in the Northern District of New York.  In the Northern District litigation, Plaintiff alleged that officers at Clinton Correctional Facility had used excessive force against him.  *Galberth* v. *Durkin*, No. 14 Civ. 115 (BKS) (ATB), 2014 WL 7409915, at *1 (N.D.N.Y. Dec. 31, 2014) (adopting the report and recommendation of the magistrate judge).  The officers moved to dismiss the case, arguing that Plaintiff had failed to exhaust his administrative remedies.  *Id.* at *6.  However, the court rejected this argument. *Id.* As the court explained, "[P]laintiff ha[d] at least attempted to allege that his mental condition prevented him from filing his grievances," and "[w]hether that allegation [was] meritorious [could not] be determined solely by reviewing the complaint." *Id.* at *8.  As a result, the court concluded that it would be impermissible to grant the defendants' Rule 12(b)(6) motion.  *Id.*

Defendants here contend that *Galberth* v. *Durkin* is distinguishable because, "in that case, [the] defendants did not address the issue of [P]laintiff's mental health as part of their motion practice, and as such, the [c]ourt could

---

[8]     Defendants contend that this case is analogous to *Johnson* v. *New York City Department of Correction*, No. 13 Civ. 6799 (CM), 2014 WL 2800753 (S.D.N.Y. June 16, 2014), where the court granted a motion to dismiss for failure to exhaust.  But that case is not on all fours with this one.  In *Johnson*, the court had records indicating that the plaintiff suffered from schizophrenia, but the plaintiff never "alleged that his schizophrenia interfered with his ability to utilize the … grievance process." *Id.* at *6.  Here, by contrast, Plaintiff explicitly alleges in the Amended Complaint that his "mental ill[ness]" was the "reason[] why" he did not file a grievance.  (Am. Compl. 4).  Thus, in this case, the Amended Complaint could reasonably be read to suggest that Plaintiff was mentally incapable of pursuing administrative remedies.

only rely upon the pleadings in deciding whether to excuse [P]laintiff's failure to exhaust." (Def. Reply 2-3). In this case, however, Defendants point to a variety of documents to support their contention that Plaintiff was capable of using the Rikers Island grievance system. (*Id.* at 3-4). *See In re Thelen LLP*, 736 F.3d 213, 219 (2d Cir. 2013) ("In adjudicating a motion to dismiss, a court may consider … the complaint, any written instrument attached to the complaint as an exhibit, any statements or documents incorporated in it by reference, and any document upon which the complaint heavily relies."). Specifically, Defendants suggest that Plaintiff's filings in this case — as well as his filings in other civil cases — indicate that he is capable of managing civil litigation. (*Id.*). Defendants reason that, if Plaintiff is well enough to follow the instructions of civil courts, he is also well enough to utilize a prison grievance system. (*See id.*).

The Court will assume, for the sake of argument, that it is proper to consider these documents in connection with a motion to dismiss. The Court will also assume that Plaintiff's filings in this litigation demonstrate that he is *currently* well enough to use the Rikers Island grievance system. Finally, the Court will assume that Plaintiff's filings in other cases show that he was well enough to use the grievance system at some point in the past. Nevertheless, even with these assumptions in place, the Court cannot jump to the conclusion that: (i) Plaintiff was well enough to participate in the grievance system during the short time that he spent on Rikers Island; or (ii) the Rikers Island grievance system was still available to Plaintiff after he was transferred to a different

correctional facility.  (*See* Am. Compl. 12).  *See, e.g.*, *Hartry* v. *County of Suffolk*, 755 F. Supp. 2d 422, 433-34 (E.D.N.Y. 2010) (suggesting that "an administrative remedy may properly be considered 'unavailable' if the act or occurrence that gives rise to the claim occurs shortly before the inmate is transferred" to a different facility that uses a different grievance procedure); *Burns* v. *Moore*, No. 99 Civ. 966 (LMM) (THK), 2002 WL 91607, at *6 (S.D.N.Y. Jan. 24, 2002) ("This Court can imagine a situation where a prisoner could plausibly argue that he was effectively denied access to an administrative remedy because he could not file a grievance ... after he was transferred from the facility in which his complaint arose."); *Muller* v. *Stinson*, No. 99 Civ. 624 (TJM), 2000 WL 1466095, at *2 (N.D.N.Y. Sept. 25, 2000) ("If, in fact, Plaintiff ... did not have an opportunity to avail himself of the grievance procedure because of his transfer, then he is not required to exhaust his administrative remedies.").  Consequently, the Court will not dismiss Plaintiff's claims against Rikers Island personnel based on his alleged failure to exhaust administrative remedies.[9]

It may well be the case, however, that after some discovery, Defendants will be able to file a summary judgment motion based on evidence that Plaintiff had the ability to utilize the prison grievance system.[10]  As a result, the Court

---

[9]   It is not clear whether Defendants are also arguing that the Court should dismiss Plaintiff's claims against Ms. Green and the Doe Defendants at Downstate Correctional Facility for failure to exhaust administrative remedies.  (*See* Def. Br. 6, n.4).  However, even if Defendants were making this argument, the Court rejects it for the same reasons discussed in the text.

[10]  The Court considered converting Defendants' motion to dismiss into a motion for summary judgment, *see Roland* v. *Smith*, 907 F. Supp. 2d 385, 388 (S.D.N.Y. 2012), but

will entertain a request that discovery be conducted in two phases: (i) a first phase in which the parties exchange information regarding Plaintiff's ability to file a grievance during the relevant time periods; and (ii) a second phase in which the parties exchange information about other factual issues in this case.

### 2. Plaintiff's Claims Against C.O. Soto, Ms. Green, the Doe Defendants, and the City of New York Must Be Dismissed as Untimely

Defendant City of New York argues that Plaintiff's claims against it are barred by the statute of limitations. (*See* Def. Br. 12-19). In addition, Defendants suggest that some of Plaintiff's claims against other defendants, named but as yet unserved, are untimely, and urges the Court to dismiss those claims *sua sponte*. (*See id.*). For the reasons that follow, the Court will dismiss Plaintiff's Claims against C.O. Soto, Ms. Green, the Doe Defendants at both Rikers Island and Downstate Correctional Facility, and the City of New York.

### a. The Court Has the Power to Dismiss Plaintiff's Untimely Claims Against Defendants Who Have Not Yet Appeared

When a plaintiff proceeds *in forma pauperis*, a district court must dismiss any of portion of the complaint that "fails to state a claim on which relief may be granted." 28 U.S.C. § 1915(e)(2)(B)(ii). Recognizing this statutory mandate, the Second Circuit has held that a district court can dismiss an indigent plaintiff's claims *sua sponte* if those claims are barred by the applicable statute of limitations. *See Milan* v. *Wertheimer*, 808 F.3d 961, 963-64 (2d Cir. 2015). Thus, this Court has considered, *sua sponte*, whether

---

it believes that some discovery on the nature of Plaintiff's illness will aid its analysis of Plaintiff's ability to exhaust administrative remedies.

Plaintiff's claims against C.O. Soto, Ms. Green, and the Doe Defendants are time-barred. (See Dkt. #3 (granting Plaintiff's request to proceed *in forma pauperis*)). To aid its consideration of this issue, and to ensure that Plaintiff receives the fairest assessment of his claims, the Court has taken into account Plaintiff's arguments that his claims against the unserved Defendants are timely. (*See* Pl. First Opp. 18-23).

### b. Plaintiff's Claims Against C.O. Soto, Ms. Green, the Doe Defendants, and the City of New York Are Untimely

"Section 1983 does not provide a specific statute of limitations. Thus, courts apply the statute of limitations for personal injury actions under state law." *Hogan* v. *Fischer*, 738 F.3d 509, 517 (2d Cir. 2013) (citing *Owens* v. *Okure*, 488 U.S. 235, 249-51 (1989); *Pearl* v. *City of Long Beach*, 296 F.3d 76, 79 (2d Cir. 2002)). In New York, personal injury actions are subject to a three-year statute of limitations. *See Pearl*, 296 F.3d at 79. The limitations period begins to run when: (i) the plaintiff knows or has reason to know of the injuries caused by an individual defendant, *see Singleton* v. *City of New York*, 632 F.2d 185, 191 (2d Cir. 1980), *cert. denied*, 450 U.S. 920 (1981); or (ii) the plaintiff knows or has reason to know that a municipal defendant has an unconstitutional "policy or custom," *see Pinaud* v. *County of Suffolk*, 52 F.3d 1139, 1157 (2d Cir. 1995).

Generally, plaintiffs are not allowed to circumvent New York's three-year statute of limitations by filing a complaint against a John Doe defendant within the three-year window, and then amending the complaint to name the

defendant at a later time.  *Hogan*, 738 F.3d at 517 (citing *Aslanidis* v. *U.S. Lines, Inc.*, 7 F.3d 1067, 1075 (2d Cir. 1993)).  As a result, if a plaintiff seeks to amend a complaint to name a John Doe defendant, and the statute of limitations has already run, the plaintiff must show that the amended complaint "relates back" to the original complaint under Federal Rule of Civil Procedure 15(c).  *Id.*

In this case, Plaintiff knew or had reason to know of the injuries caused by C.O. Soto, Ms. Green, and the Doe Defendants at the time those injuries occurred, *i.e.*, in April 2011.  (*See* Am. Compl. 2 (noting that the Rikers Island incidents occurred on April 8 and 9, 2011); Pl. First Opp. 16 (correcting Amended Complaint to reflect that Plaintiff met with mental health personnel at Downstate in April 2011)).  Similarly, taking the allegations in the Amended Complaint as true, Plaintiff knew or should have known that the City had an unconstitutional policy or custom by April 2011, when multiple officers at Rikers Island declined his requests for mental health treatment, even after they learned of his suicide attempt.  (*See id.* at 3, 8-9).  As a result, Plaintiff was required to file any claims that arose out of his injuries by April 2014.  Plaintiff filed the underlying Complaint before this date, naming Captain Washington, Ms. Hurnst, and several John Doe defendants who worked on Rikers Island. (*See* Dkt. #2).  In November 2014, Plaintiff filed his Amended Complaint, naming C.O. Soto, Ms. Green, and the City of New York.  (See Dkt. #45).  In addition, the Court anticipates that, at some point in the future, Plaintiff may seek to file a Second Amended Complaint naming more of the John Doe

Defendants.  Thus, the Court must determine whether the Amended Complaint — and any potential Second Amended Complaint — "relate back" to the original Complaint under Federal Rule of Civil Procedure 15(c).  *Hogan*, 738 F.3d at 517.

One could argue that Plaintiff's Amended Complaint, or potential Second Amended Complaint, would "relate back" to the original Complaint under Federal Rule of Civil Procedure 15(c)(1)(C) or 15(c)(1)(A).  Ultimately, however, these arguments could not succeed.

### i.   The Amended Complaint Does Not Relate Back to the Original Complaint Under Federal Rule of Civil Procedure 15(c)(1)(C)

For an amended complaint to "relate back" to an original complaint under Rule 15(c)(1)(C), it must meet four criteria: (i) any new claim "must have arisen out of conduct set out in the original pleading"; (ii) any newly named defendant "must have received such notice that it will not be prejudiced in maintaining its defense"; (iii) any newly named defendant must have known that "*but for a mistake of identity,* the original action would have been brought against [him]"; and (iv) "the second and third criteria [must be] fulfilled within 120 days of the filing of the original complaint, and … the original complaint [must have been] filed within the limitations period."  *Barrow* v. *Wethersfield Police Dept.,* 66 F.3d 466, 468-69 (2d Cir. 1995) (emphasis added).[11]  In this

---

[11]   The 120-day requirement is derived from former Federal Rule of Civil Procedure 4(m). The Court will apply the 120-day requirement because it was still operative when this motion was filed.  (Under the most current version of the rules, the 120-day requirement has been converted into a 90-day requirement.)

case, Plaintiff's Amended Complaint — and any potential Second Amended Complaint — cannot satisfy the third criterion.

Plaintiff could not plausibly maintain that he would have named C.O. Soto or the Rikers Island Doe Defendants in his original pleading, "but for a mistake of identity."  The Court's correspondence with Plaintiff both before and after it issued a *Valentin* order demonstrates that Plaintiff did not know the identity of C.O. Soto or the Rikers Island Doe Defendants when he filed his Complaint.  However, the Second Circuit has held that a lack of knowledge about a defendant's identity cannot be characterized as a "mistake of identity." *Hogan*, 738 F.3d at 517-18.  As a result, Rule 15(c)(1)(C) "preclude[s] relation back" in cases like this one, where a plaintiff does not know who the defendants are until the statute of limitations has run.  *Id.* (citing *Tapia-Ortiz* v. *Doe,* 171 F.3d 150, 152 (2d Cir. 1999); *Barrow,* 66 F.3d at 470).

Similarly, Plaintiff could not claim that, "but for a mistake of identity," he would have named Ms. Green or the Downstate Doe Defendants at an earlier time.  Plaintiff's original Complaint did not make allegations against any personnel at Downstate Correctional Facility.  (*See generally* Dkt. #2).  Thus, Plaintiff could not plausibly claim that his original Complaint simply named the wrong Downstate staff members.

Finally, Plaintiff could not plausibly assert that, "but for a mistake of identity," he would have brought his claims against the City of New York in the original Complaint.  The original Complaint does not name any administrative agency.  (*See generally* Dkt. #2).  Nor does it name any other entity that may

have had supervisory authority over the original defendants.  (*See generally id.*).  Thus, Plaintiff's Amended Complaint — and any potential Second Amended Complaint — cannot satisfy the criteria for relation back under Federal Rule of Civil Procedure 15(c)(1)(C).

### ii.   The Amended Complaint Does Not Relate Back to the Original Complaint Under Federal Rule of Civil Procedure 15(c)(1)(A)

Federal Rule of Civil Procedure 15(c)(1)(A) offers a second basis for relation back, providing that an amended pleading relates back to an original pleading when "'the law that provides the applicable statute of limitations allows relation back.' ... Thus, under Rule 15(c)(1)(A), [courts] must determine if New York state law provides a 'more forgiving principle of relation back' in the John Doe context, compared to the federal relation back doctrine under Rule 15(c)(1)(C)." *Hogan*, 738 F.3d at 518.  The Second Circuit has held that New York law in fact provides a "more forgiving" principle of relation back for cases involving John Doe defendants.  *Id.*  Section 1024 of the New York Civil Practice Law and Rules allows a plaintiff "who is ignorant, in whole or in part, of the name or identity of a [defendant], [to] proceed against such [defendant] as an unknown party."  If the plaintiff later learns the name of the defendant, he may amend the original complaint to reflect that name.  *See* N.Y. C.P.L.R. § 1024 (McKinney 2013); *Hogan*, 738 F.3d at 518-19.

To take advantage of Section 1024, a plaintiff must meet two requirements.  "First, the [plaintiff] must exercise due diligence, prior to the running of the statute of limitations, to identify the defendant by name.

Second, the [plaintiff] must describe the John Doe party in such form as will fairly apprise the party that [he] is the intended defendant." *Hogan*, 738 F.3d at 519 (internal quotation marks and citations omitted).

Here, Plaintiff cannot take advantage of Section 1024 because he did not exercise due diligence to identify Defendants "*prior to the running of the statute of limitations.*" *Hogan*, 738 F.3d at 519 (emphasis added). Plaintiff waited more than two and one-half years after the alleged misconduct to file his Complaint. Nevertheless, Plaintiff has not alleged or argued that: (i) he was using that time to prepare his lawsuit; or (ii) he took some other step during that stretch of time (such as writing a letter to someone at Rikers Island or Downstate Correctional Facility) to try to identify the individuals who had allegedly ignored his medical needs or used excessive force against him. Consequently, Plaintiff cannot show that he exercised due diligence to identify C.O. Soto, Ms. Green, the Doe Defendants, or the City of New York during the limitations period.

As Plaintiff notes, he did take several steps to try to identify Defendants *after* April 9, 2014. (*See* Pl. First Opp. 18-23). However, Plaintiff's diligence after the limitations period ended cannot compensate for his lack of diligence in the two and one-half years following the incidents at Rikers Island and Downstate Correctional Facility. *See Williams* v. *United States*, No. 07 Civ. 3018 (RJS) (THK), 2010 WL 963474, at *13 (S.D.N.Y. Feb. 25, 2010) (recommending that district court find C.P.L.R. § 1024 inapplicable because of the incarcerated plaintiff's failure to demonstrate diligence), *report and*

25

*recommendation adopted,* No. 07 Civ. 3018 (RJS) (THK), 2010 WL 963465 (S.D.N.Y. Mar. 16, 2010).  Thus, the Court will dismiss Plaintiff's claims against C.O. Soto, Ms. Green, the Doe Defendants at Rikers Island and Downstate Correctional Facility, and the City of New York.

### 3. Plaintiff Has Stated a Claim Against Captain Washington, But Not Against Ms. Hurnst

Finally, Defendants contend that Plaintiff has failed to state a claim of deliberate indifference against either of the two remaining defendants, Captain Washington and Ms. Hurnst.  The Court will address each of these arguments in turn.

### a. Plaintiff Has Stated a Claim Against Captain Washington

Under the Eighth Amendment, it is unconstitutional for prison staff to show "deliberate indifference to serious medical needs of prisoners."  *Estelle* v. *Gamble*, 429 U.S. 97, 104-05 (1976).  "This is true whether the indifference is manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed."  *Id.* (footnotes omitted).

To prevail on a constitutional claim of deliberate indifference, a plaintiff must prove that he suffered from an objectively serious medical condition, which the defendants knew of and deliberately disregarded.  *Chance* v. *Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998).  In the Second Circuit, serious medical conditions include serious psychiatric conditions.  *Atkins* v. *County of Orange*, 372 F. Supp. 2d 377, 408 (S.D.N.Y. 2005).

26

Taking the allegations in the Amended Complaint as true, there can be no doubt that Plaintiff was suffering from a serious medical condition when he arrived at Rikers Island: Plaintiff alleges that, on April 8, his mental illness was so pronounced that he tried to commit suicide.  (Am. Compl. 3).  *See Young* v. *Choinski*, 15 F. Supp. 3d 172, 184 (D. Conn.), *reconsideration denied in part,* 15 F. Supp. 3d 194 (D. Conn. 2014) ("[C]ase law within this Circuit recognizes that depression combined with severe anxiety attacks or suicide attempts is a serious medical need.") (internal quotation marks omitted).  In addition, when the allegations in the Amended Complaint are construed in the light most favorable to Plaintiff, they suggest that Captain Washington knew of and deliberately disregarded this condition.  Plaintiff claims that, shortly after he tried to hang himself, he spotted Captain Washington in the hallway, and tried to explain what had happened earlier in the day.  (Am. Compl. 9).  At this stage in the proceedings, the Court must presume that Plaintiff's explanation included a statement that he had just tried to kill himself.  Nevertheless, Captain Washington did not arrange for Plaintiff to receive immediate attention; instead she allowed Plaintiff to wait overnight in the "bull pen[]."  (*Id.*).  This response to Plaintiff's plight, as alleged, shows a deliberate disregard for his medical needs.  *Cf. Young*, 15 F. Supp. 3d at 185 (refusing to dismiss a deliberate indifference claim because there was "a genuine issue of material fact as to whether [the defendant] intentionally refused to take action to summon mental health or medical personnel to evaluate and treat [the plaintiff] after [the defendant] became aware of [his] suicidal thoughts").

### b.   Plaintiff Has Not Stated a Claim Against Ms. Hurnst

By contrast, the Court must dismiss Plaintiff's allegations against Ms. Hurnst *sua sponte* because those allegations fail to state a claim upon which relief can be granted.  *See* 28 U.S.C. § 1915(e)(2)(B)(ii).  Plaintiff alleges that Ms. Hurnst disregarded his psychiatric condition by allowing him to be transferred to Clinton Correctional Facility after he had explained his fears regarding that facility.  (Am. Compl. 10).  Even if Ms. Hurnst — as a psychologist — had any authority to stop the transfer, this Court cannot find that allowing Plaintiff to be sent to another facility with a mental health program constituted a deliberate disregard for Plaintiff's medical needs.

### CONCLUSION

For the foregoing reasons, Plaintiff's claims against Ms. Hurnst, C.O. Soto, Ms. Green, the Doe Defendants, and the City of New York are dismissed. However, Plaintiff still has a viable claim against Captain Washington.  The Clerk of Court is ordered to terminate docket entry 82.

The parties are ordered to appear for a telephone conference with the Court on Tuesday, May 3, 2016, at 10:00 a.m.  Counsel for Defendant Washington shall arrange for both parties to call the Court at (212) 805-0290 pursuant to the scheduling order separately issued on this date.

SO ORDERED.

Dated:      March 29, 2016
            New York, New York

_____
KATHERINE POLK FAILLA
United States District Judge

*A copy of this Order was mailed by Chambers to:*
Gregory Galberth
03A0661
Marcy Correctional Facility
Box 3600
Marcy, New York, 13403-3600

28