UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------X
                                 :

GREGORY GALBERTH,                :
                                 :

                    Plaintiff,    :

                                 :

                 v.               :

                                 :

CAPTAIN WASHINGTON,      :
                                 :

                    Defendant.  :

                                 :
------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: July 31, 2017

14 Civ. 691 (KPF)

OPINION AND ORDER

KATHERINE POLK FAILLA, District Judge:

Plaintiff Gregory Galberth contends that Defendant Captain Washington showed deliberate indifference to Plaintiff's medical needs during Plaintiff's brief period of incarceration at Rikers Island in April 2011. Defendant has moved for summary judgment, contending that there is no genuine dispute of material fact that Plaintiff was required to, and did not, fully exhaust the available administrative remedies as required by the Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e. For the reasons that follow, the Court agrees and grants Defendant's motion.

## BACKGROUND[1]

### A.    Factual Background

#### 1.    Plaintiff's Treatment at Rikers Island

"Plaintiff was incarcerated at Rikers Island from April 4, 2011, until April 20, 2011." (Def. 56.1 ¶ 20). Plaintiff claims that upon his arrival at the facility,

---

[1]    For convenience, the Court will refer to Defendant's memorandum of law in support of her motion for summary judgment as "Def. Br." (Dkt. #135), Plaintiff's opposition to

he "ask[ed] to see mental health [professionals] but was ignored by many shift officers." (AC 3).

On or around April 9, 2011, Plaintiff threatened and/or attempted to hang himself. (Def. 56.1 ¶ 19; Def. Br. 2). Plaintiff alleges that afterward, he

Defendant's motion as "Pl. Opp." (Dkt. #147), and Defendant's reply memorandum of law in further support of her motion as "Def. Reply" (Dkt. #159). The materials Plaintiff filed to supplement his opposition will be referred to "Pl. Supp'l Opp." Defendant's memorandum in reply to this supplemental filing will be referred to as "Def. Supp'l Reply" (Dkt. #165).

The facts in this Opinion are drawn from the Amended Complaint (the "AC" (Dkt. #45)) and the parties' submissions in connection with Defendant's motion for summary judgment, including Defendant's Local Rule 56.1 Statement ("Def. 56.1" (Dkt. #134)); the Supplement thereto ("Def. Supp'l 56.1" (Dkt. #166)); and the Declaration of Defendant's counsel Daniel Oliner ("Oliner Decl." (Dkt. #133)). The exhibits attached to defense counsel's declaration will be referred to by their letter designation, e.g., "Oliner Decl., Ex. [ ]." When the Court cites a particular page in one of Plaintiff's submissions, it is citing to the page numbers assigned by the Court's electronic case filing (or "ECF") system.

Citations to Defendant's Local Rule 56.1 Statement incorporate by reference the documents cited therein. Generally speaking, where facts stated in a party's Local Rule 56.1 Statement are supported by testimonial or documentary evidence, and denied with only a conclusory statement by the other party, the Court finds such facts to be true. *See* Local Rule 56.1(c), (d); *Biberaj* v. *Pritchard Indus., Inc.*, 859 F. Supp. 2d 549, 553 n.3 (S.D.N.Y. 2012) ("A nonmoving party's failure to respond to a Rule 56.1 statement permits the court to conclude that the facts asserted in the statement are uncontested and admissible." (internal quotation mark omitted) (quoting *T.Y.* v. *N.Y.C. Dep't of Educ.*, 584 F.3d 412, 418 (2d Cir. 2009))).

In this case, Plaintiff did not oppose properly Defendant's Rule 56.1 Statement despite being provided with the guidance afforded by the "Notice to Pro Se Litigant" required under Local Civil Rule 56.2. (*See* Dkt. #132). But "[w]hile *pro se* litigants are 'not excused from meeting the requirements of Local Rule 56.1,' the Court nonetheless 'retains some discretion to consider the substance of the [*pro se* party's] arguments, where actually supported by evidentiary submissions.'" *Betts* v. *Rodriquez*, No. 15 Civ. 3836 (JPO), 2017 WL 2124443, at *1 n.1 (S.D.N.Y. May 15, 2017) (quoting *Wali* v. *One Source Co.*, 678 F. Supp. 2d 170, 178 (S.D.N.Y. 2009)) (citing *Holtz* v. *Rockefeller & Co.*, 258 F.3d 62, 73 (2d Cir. 2001) ("A district court has broad discretion to determine whether to overlook a party's failure to comply with local court rules" and may opt to conduct an assiduous review of the record even where one of the parties has failed to file a Rule 56.1 statement.)). Here, because Plaintiff is proceeding *pro se*, "this Court has conducted an assiduous review of the record to determine if there is any evidentiary support for his assertions of fact that do not cite to evidence and to determine if there are any other material issues of fact." *Betts*, 2017 WL 2124443, at *1 n.1 (internal quotation marks omitted) (quoting *Geldzahler* v. *N.Y. Med. Coll.*, 746 F. Supp. 2d 618, 620 n.1 (S.D.N.Y. 2010)); *see also, e.g., Anderson* v. *City of New Rochelle*, No. 10 Civ. 4941 (ER), 2012 WL 3957742, at *7 (S.D.N.Y. Sept. 4, 2012).

requested help from Defendant as she walked by his cell, but Defendant did not take Plaintiff to see a mental health provider. (AC 9; Def. Br. 2; Pl. Br. 32-33). Later, when Plaintiff was being escorted to the "bull pen[]," he encountered Defendant in the hallway, and tried to explain what had happened earlier in the day. (AC 9; Pl. Br. 32-33). Defendant allegedly told Plaintiff that no one had called her about the situation. (AC 9; Pl. Br. 32-33). Plaintiff waited overnight in the "bull pen[]" with no bed and no pillow. (AC 9; Pl. Br. 32-33). In the morning, Plaintiff was taken to a "mental observation trailer," where he saw a "doctor for mental health." (AC 9; *see also* Pl. Br. 32-33).

Beyond this visit, during Plaintiff's 16-day stay at Rikers Island, "at least 13 different Correctional Health Services Staff members examined [P]laintiff." (Def. 56.1 ¶ 22 (citing Oliner Decl., Ex. I)). The parties dispute the results of these examinations, and Plaintiff's mental health condition during this time. The nub of the dispute is the following: The parties agree that Plaintiff did not file any grievances related to any of the claims Plaintiff brought in this case. (Def. 56.1 ¶ 10; AC 4). They dispute, however, the reasons for that inaction. The Court will consider the parties' positions, and the record support therefor, in the sections that follow.

### a. Defendant's Account

According to Defendant, Plaintiff's medical records "indicate that he was not diagnosed with psychosis" at any of his many examinations, nor indeed at any point during his 16 days at Rikers Island. (Def. 56.1 ¶ 23). Moreover, "no

clinicians observed plaintiff experiencing any perceptual disturbances at any point during those 16 days." (*Id.* at ¶ 24). And none of Plaintiff's medical records indicates that "he experienced any psychiatric decompensation." (*Id.* at ¶ 30).

Rather, Defendant argues, "Plaintiff's medical records explicitly indicate that clinicians observed no evidence/symptoms of psychosis during his examinations on April 10, 11, 12, and 17." (Def. 56.1 ¶ 25). "Plaintiff's Global Assessment of Functioning ('GAF') score was diagnosed on April 8, 11, and 14, and assessed as being 60, 55-60, and, 55 on those dates, respectively, by three different clinicians." (*Id.* at ¶ 28).[2] Plaintiff was found to be alert and oriented. (*Id.* at ¶ 27). Plaintiff was "aware of his impending transfer to a DOCCS facility upstate" (*id.* at ¶ 31); his medication needs and schedule (*id.* at ¶¶ 32-33, 37); and his medical history (*id.* at ¶¶ 34-36).

Moreover, on April 6, 2011, "[P]laintiff appeared before the Hon. Lewis Bart Stone, Justice of the Supreme Court, New York County, for a resentencing hearing." (Def. 56.1 ¶ 38; *see also id.* at ¶¶ 39-44). At the hearing, "Plaintiff's counsel did not raise the issue of plaintiff's competency/incompetency," and Plaintiff "chose to speak," "spoke intelligibly," and raised issues "pertaining to the potential time he would serve." (Def. 56.1 ¶¶ 41-44).

---

[2]    The Court understands that "[a]ccording to the version of the Diagnostic and Statistical Manual of Mental Disorders applicable in April 2011 — the DSM-IV-TR — a GAF score from 51 to 60 indicate[s] moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, work or school functioning (e.g. few friends, conflicts with peers or co-workers)." (Def. 56.1 ¶ 29 (citing Oliner Decl., Ex. J)).

### b. **Plaintiff's Account**[3]

According to Plaintiff, Defendant's depiction of Plaintiff's medical records and mental state during his April 2011 confinement at Rikers Island is incorrect and "belied by the record." (Pl. Br. 7). Instead, Plaintiff believes that his medical records show that his "mental state of mind was consistently depressed" and that he suffered from post-traumatic stress disorder ("PTSD") during his stay at Rikers Island. (*Id.* at 18). Plaintiff indicates that "he consistently suffered from depressive disorder PTSD with symptoms of a brief psychotic disorder with symptoms also related to psychosis." (*Id.* at 19). And he contends that the existence of these conditions is proven by the records of the consultations performed by doctors Alan Kaye and Juan Medina, as well as by Licensed Master Social Worker Laura Van Wyk.

According to Plaintiff, Dr. Kaye's records indicate Plaintiff was experiencing symptoms of psychosis and a perceptual disturbance. (Pl. Br. 7; Pl. Supp'l Opp. 25 ("[Plaintiff] was diagnosed with having psychosis symptom[s] ... by Dr. Kay[e].")). Plaintiff's medical records purportedly detail Plaintiff's history of auditory hallucinations and indicate that Plaintiff was suffering from delusional thinking and psychosis. (Pl. Br. 7-8; Pl. Supp'l Opp. 18-20). Dr. Kaye also documented that Plaintiff "was suffering from intrusive thoughts," a depressive disorder, an anxiety disorder, and a post-traumatic stress disorder, and was hypervigilant, delusional, and exhibiting

---

[3]     Except where otherwise noted, the Court will omit for the sake of clarity from its quotations to Plaintiff's briefing any capitalizations, emphases, misspellings, and grammatical errors.

symptoms of hallucinations. (Pl. Br. 9). Plaintiff had been abused, and felt afraid as a result, because he is "effeminate," "feels female at times," and identifies as "transgender." (*Id.* at 10).

Plaintiff further claims that the records kept by Dr. Juan Medina from Plaintiff's visit on April 10, 2011, demonstrate that Plaintiff "was agitated" and "smashing his belonging[s] against [the] wall." (Pl. Br. 10). Plaintiff was placed in mental observation housing that was used for those at severe risk for self-harm and kept in this housing until April 20, 2011. (*Id.* at 11).

Plaintiff also sources his argument to Ms. Van Wyk's notes, which indicate that on April 14, 2011, Plaintiff reported experiencing auditory hallucinations and delusional flashbacks, which were causing him to feel depressed and irritable. (Pl. Br. 11-12, 14). According to Plaintiff, Ms. Van Wyk believed Plaintiff would have serious symptoms, a serious impairment, or functional limitation if he were not treated with medication and psychiatric rehabilitation. (*Id.* at 17; Pl. Supp'l Opp. 23). And she purportedly indicated that Plaintiff's "functioning was concerning" and that Plaintiff was suffering from "serious impairment [and was] functionally limited by mental illness." (Pl. Br. 17; *see also* Pl. Supp'l Opp. 23).

To the extent that his medical records indicate the contrary view — that Plaintiff was *not* psychotic and delusional during his time at Rikers Island — Plaintiff asserts that his "clinical records are contradictory" (Pl. Br. 14; *see also id.* at 15-16), "inaccurate[,] and misleading" (*id.* at 23; *see also id.* at 30). Plaintiff indicates that most of the clinicians who saw him did not fully assess

6

him, and as such "could not make an adequate judgment" with regard to "Plaintiff's overall mental state of mind in [the] 2-5 min[ute] assessment" they performed in their single consultation with Plaintiff. (Pl. Supp'l Opp. 6). Indeed, Plaintiff observes, most of the health services staff members Plaintiff saw "were not related to mental health staff clinicians and did not make mental health diagnos[es]." (*Id.* at 15). In Plaintiff's estimation, only Dr. Kaye met with Plaintiff for a sufficiently long period, accurately diagnosed him with several mental disorders, and noted evidence of delusional thinking and Plaintiff's report of hallucinations. (*Id.* at 6-7). Plaintiff indicates that there was no mental health assessment performed on April 11, 2011. (Pl. Br. 29). And he disputes the GAF score that was assessed on April 14, 2011. (Pl. Supp'l Opp. 22-23).

Given the mental and emotional issues he describes in his court submissions, "filing a grievance never entered Plaintiff['s] [mind]," which was flooded with "consistent paranoia[,] depressive feelings[,]" fear, anxiety, and PTSD. (Pl. Br. 21-22; *see also* Pl. Supp'l Opp. 9 ("[Plaintiff's] emotional feelings became to[o] much to handle.")). Plaintiff asserts that "he did not file a grievance" because he "was mentally unstable at the time," and "suffering from a mixed mental illness plus PTSD," which caused him to experience "flashback[s] to traumatic events." (Pl. Supp'l Opp. 11; *see also id.* at 33). "Plaintiff was unaware of the grievance procedure due to the fact he was not mentally stable and he became mentally unstable when mental illness invaded his mind to the point he began to hear voice[s]." (*Id.* at 13). Plaintiff believes

7

he was not "perceiving things very well" given his "mixed disturbance of emotions," "flashbacks[,] delusions[,] and hallucinations." (Pl. Br. 15). Moreover, "no one told [Plaintiff] that he should file a grievance." (Pl. Supp'l Opp. 14-15).

Finally, Plaintiff argues that no conclusions can be drawn regarding his competency from his appearance and conduct at the April 6, 2011 resentencing proceeding. (Pl. Br. 5-6; Pl. Supp'l Opp. 26-32). Because Plaintiff's competency was not at issue at the proceeding, he reasons that the proceeding is entirely irrelevant to this litigation. (Pl. Br. 5-6; Pl. Supp'l Opp. 26-32).

### 2. Relevant Grievance Procedures

"The New York City Department of Correction has an established administrative grievance process — the Inmate Grievance and Request Program ('IGRP')." (Def. 56.1 ¶ 3). "The version of the IGRP that was in effect in April 2011 was No. 3375R-A," the first step of which required an inmate "to submit a complaint to the Inmate Grievance Resolution Committee within 10 business days from the date the alleged issue took place." (*Id.* at ¶¶ 4-5 (citing Oliner Decl., Ex. C)). The IGRP ensured that inmates seeking to grieve who were "disabled or expressed difficulty in communicating and/or understanding," or who "did not speak or write English sufficiently" were afforded special assistance with the grievance process. (*Id.* at ¶¶ 6-7). And it permitted extensions of the 10-day submission time where an inmate demonstrated that he "was prevented by circumstances beyond his ... control from submitting the

request within the established time frame." (Oliner Decl., Ex. C, at

§ IV(B)(1)(b)).

Defendant claims that when Plaintiff was admitted to Rikers Island, he

was given a copy of an "Inmate Handbook." (Def. 56.1 ¶ 8 (citing Oliner Dec.,

Ex. D)). And indeed, on April 4, 2011, Plaintiff signed an "Inmate Rule Book

and Inmate Handbook Receipt" indicating that he had received Rule Book

#228369 and Handbook #228309. (Oliner Dec., Ex. D). The handbook

"describe[s] the grievance procedures[,] including the assistance procedure in

the event an inmate, *inter alia*, suffered from a disability." (Def. 56.1 ¶ 9 (citing

Oliner Decl., Ex. E)). Plaintiff disputes the fact that he was given an Inmate

Handbook, on the basis that "there's no evidence provided that he received"

one. (Pl. Supp'l Opp. 10-11).

**B.      Procedural Background**

On January 27, 2014, Plaintiff initiated this action against employees of

two different correctional facilities in this District, Rikers Island and Downstate

Correctional Facility. (Dkt. #2). Initially, Plaintiff identified these employees in

his complaint (the "Complaint") as "Captain Washington," "Ms. Hurnst," and

various John and Jane Does. (*Id.*). After this Court issued an order pursuant

to *Valentin* v. *Dinkins*, 121 F.3d 72 (2d Cir. 1997) (per curiam), the New York

City Law Department (the "Law Department") sent Plaintiff additional

information about the individuals involved in his case. In response to that

information, Plaintiff filed an amended complaint that added "C.O. Soto" and

the City of New York as defendants (the "AC" (Dkt. #45)). In brief, the AC

alleged that the defendants showed deliberate indifference to Plaintiff's medical needs and/or used excessive force against him. (*Id.*).

On August 24, 2015, Defendants Washington and the City of New York moved to dismiss many of Plaintiff's claims. (Dkt. #82). On March 29, 2016, the Court granted the motion in part and dismissed Plaintiff's claims against Ms. Hurnst, C.O. Soto, Ms. Green, the Doe Defendants, and the City of New York (the "March 2016 Opinion" (Dkt. #112)). *See generally Galberth* v. *Washington*, No. 14 Civ. 691 (KPF), 2016 WL 1255738 (S.D.N.Y. Mar. 29, 2016). The Court found that Plaintiff's Claims against C.O. Soto, Ms. Green, the Doe Defendants, and the City of New York were untimely; and that Plaintiff had failed to state a deliberate-indifference claim against Ms. Hurnst. *Id.* However, the Court denied Defendants' motion with regard to Plaintiff's claim against Defendant Washington, leaving Plaintiff with a single viable deliberate-indifference claim. *Id.*

As directed by the March 2016 Opinion, the parties proceeded with limited discovery on the issue of Plaintiff's ability to file a grievance during the relevant time periods. (*See* Def. Br. 1). Because Defendant believed "the undisputed evidence shows that [P]laintiff was capable of — but did not — fully exhaust the available administrative remedies, as required by the [PLRA], Defendant ... move[d] for summary judgment on [P]laintiff's claim against [Defendant]" on November 15, 2016. (*Id.*; *see also* Dkt. #131-34, 136-37). The Court received Plaintiff's opposition to Defendant's motion on February 16, 2017 (Dkt. #146), which opposition was dated January 31, 2017 (Dkt. #147).

The motion was fully briefed when Defendant filed her reply in further support of her motion on April 28, 2017. (Dkt. #159).

However, because Plaintiff is incarcerated and proceeding *pro se*, the Court also accepted a package of materials dated May 2, 2017, as a supplement to Plaintiff's original opposition. (Dkt. #160). Defendant was given the opportunity to file a sur-reply (*id.*), which she filed on June 2, 2017 (Dkt. #165-66).

Much of the parties' briefing was filed under seal, because it contained Plaintiff's sensitive medical information.

## DISCUSSION

**A.  Applicable Law**

**1.  Rule 56 Motions for Summary Judgment**

Rule 56(a) provides that a "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Thus, "[a] motion for summary judgment may properly be granted ... only where there is no genuine issue of material fact to be tried, and the facts as to which there is no such issue warrant the entry of judgment for the moving party as a matter of law." *Rogoz* v. *City of Hartford*, 796 F.3d 236, 245 (2d Cir. 2015) (internal quotation marks omitted) (quoting *Kaytor* v. *Elec. Boat Corp.,* 609 F.3d 537, 545 (2d Cir. 2010)).

"The function of the district court in considering [a] motion for summary judgment is not to resolve disputed questions of fact but only to determine

whether, as to any material issue, a genuine factual dispute exists." *Rogoz*, 796 F.3d at 245 (quoting *Kaytor*, 609 F.3d at 545). And "'[i]n determining whether summary judgment is appropriate,' a court must 'construe the facts in the light most favorable to the non-moving party and ... resolve all ambiguities and draw all reasonable inferences against the movant.'" *Kuhbier* v. *McCartney, Verrino & Rosenberry Vested Producer Plan*, — F. Supp. 3d —, No. 14 Civ. 888 (KMK), 2017 WL 933126, at *7 (S.D.N.Y. Mar. 8, 2017) (omission in original) (quoting *Brod* v. *Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011)).

A party moving for summary judgment "bears the initial burden of demonstrating 'the absence of a genuine issue of material fact.'" *ICC Chem. Corp.* v. *Nordic Tankers Trading a/s*, 186 F. Supp. 3d 296, 301 (S.D.N.Y. 2016) (quoting *Celotex Corp.* v. *Catrett*, 477 U.S. 317, 323 (1986)). "[A] fact is material if it 'might affect the outcome of the suit under the governing law.'" *Royal Crown Day Care LLC* v. *Dep't of Health & Mental Hygiene of City of N.Y.*, 746 F.3d 538, 544 (2d Cir. 2014) (quoting *Anderson* v. *Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)). And "[a] dispute is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Negrete* v. *Citibank, N.A.*, — F. Supp. 3d —, No. 15 Civ. 7250 (RWS), 2017 WL 758516, at *6 (S.D.N.Y. Feb. 27, 2017) (quoting *Liberty Lobby*, 477 U.S. at 248).

Neither the movant nor the nonmovant may rest on allegations in the pleadings; each party must point to specific evidence in the record to carry its burden on summary judgment. *Celotex*, 477 U.S. at 324; *Matsushita*, 475 U.S.

at 586.[4]  Nor may the non-moving party "rely on conclusory allegations or unsubstantiated speculation" to defeat a motion for summary judgment. *Jeffreys* v. *City of N.Y.*, 426 F.3d 549, 554 (2d Cir. 2005) (internal quotation marks omitted) (quoting *Fujitsu Ltd.* v. *Fed. Express Corp.*, 247 F.3d 423, 428 (2d Cir. 2001); *accord Kerzer* v. *Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998). "[T]he mere existence of a scintilla of evidence in support of the plaintiff's position [is] insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Jeffreys*, 426 F.3d at 554 (internal alterations and quotation marks omitted) (quoting *Anderson*, 477 U.S. at 252).

## 2.    The PLRA's Exhaustion Requirement

"The PLRA instructs that '[n]o action shall be brought with respect to prison conditions under [42 U.S.C. § 1983] ... by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.'" *Williams* v. *Corr. Officer Priatno*, 829 F.3d 118, 122 (2d Cir. 2016) (alterations and omission in original) (quoting 42 U.S.C. § 1997e(a)).  This "language is 'mandatory':  An inmate 'shall' bring 'no action' (or said more conversationally, may not bring any action) absent exhaustion of

---

[4]    The Court is mindful of Plaintiff's *pro se* status, and the "special solicitude" to which it entitles him. *See Tracy* v. *Freshwater*, 623 F.3d 90, 100-04 (2d Cir. 2010); *see also McLeod* v. *Jewish Guild for the Blind*, — F.3d —, No. 15-2898-cv, 2017 WL 3044626, at *3 (2d Cir. July 19, 2017) (per curiam) (affirming "well-worn precedent concerning a district court's obligation to liberally construe pro se submissions").  The Court notes however, that "[s]uch special solicitude is not unlimited." *Blalock* v. *Jacobsen*, No. 13 Civ. 8332 (JMF), 2016 WL 796842, at *2 (S.D.N.Y. Feb. 22, 2016).  "Provided the moving party has met its initial burden of demonstrating the absence of a genuine issue of material fact, a *pro se* party opposing summary judgment must still 'come forward with evidence demonstrating that there is a genuine dispute regarding material fact.'" *Id.* (quoting *Bennett* v. *Bailey*, No. 07 Civ. 7002 (PKC), 2010 WL 1459192, at *3 (S.D.N.Y. Apr. 9, 2010)).

available administrative remedies." *Ross* v. *Blake*, — U.S. —, 136 S. Ct. 1850, 1856 (2016) (quoting *Woodford* v. *Ngo*, 548 U.S. 81, 85 (2006)).

Moreover, exhaustion must be "proper," "which 'means using all steps that the agency holds out, and doing so *properly* (so that the agency addresses the issues on the merits).'" *Woodford*, 548 U.S. at 90 (emphasis in original) (quoting *Pozo* v. *McCaughtry*, 286 F.3d 1022, 1024 (7th Cir. 2002)). "Proper exhaustion demands compliance with [a prison grievance system's] deadlines and other critical procedural rules because no adjudicative system can function effectively without imposing some orderly structure on the course of its proceedings." *Williams*, 829 F.3d at 122 (internal quotation marks omitted) (quoting *Woodford*, 548 U.S. at 90-91).

Accordingly, a court adjudicating issues of exhaustion under the PLRA may not take into account any "special circumstances" that it might believe justify a prisoner's failure to comply with the requirements of the administrative process available to him. *Ross*, 136 S. Ct. at 1856-58 (abrogating holding of *Giano* v. *Goord*, 380 F.3d 670 (2d Cir. 2004), which allowed for special-circumstance consideration); *Williams*, 829 F.3d at 123. "[A] court may not excuse a failure to exhaust, even to take such circumstances into account." *Ross*, 136 S. Ct. at 1856.

The PLRA allows only one "textual exception to mandatory exhaustion. Under § 1997e(a), the exhaustion requirement hinges on the 'availab[ility]' of administrative remedies: An inmate, that is, must exhaust available remedies, but need not exhaust unavailable ones." *Ross*, 136 S. Ct. at 1858; *Williams*,

829 F.3d at 123 (adopting *Ross*'s "framing [of] the exception issue entirely within the context of whether administrative remedies were actually available to the aggrieved inmate").  Grievance procedures are "available" if they "are 'capable of use' to obtain 'some relief for the action complained of.'"  *Ross*, 136 S. Ct. at 1859 (quoting *Booth* v. *Churner*, 532 U.S. 731, 738 (2001)).

In *Ross*, the Court provided three examples "of circumstances in which an administrative remedy, although officially on the books, is not capable of use to obtain relief."  *Ross*, 136 S. Ct. at 1859.  The *Ross* Court held that

> [a]n administrative procedure is unavailable when: [i] "it operates as a simple dead end — with officers unable or consistently unwilling to provide any relief to aggrieved inmates"; [ii] it is "so opaque that it becomes, practically speaking, incapable of use"; or [iii] "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation."

*Riles* v. *Buchanan*, 656 F. App'x 577, 580 (2d Cir. 2016) (summary order) (quoting *Ross*, 136 S. Ct. at 1859-60).  It is the province of the court to determine whether such circumstances exist in a given case.  *See, e.g.*, *Hubbs* v. *Suffolk Cty. Sheriff's Dep't*, 788 F.3d 54, 59 (2d Cir. 2015) ("Whether an administrative remedy was available to a prisoner in a particular prison or prison system is ultimately a question of law, even when it contains factual elements."); *Messa* v. *Goord*, 652 F.3d 305, 309 (2d Cir. 2011); *Rickett* v. *Orsino*, No. 10 Civ. 5152 (CS) (PED), 2013 WL 1176059, at *9 (S.D.N.Y. Feb. 20, 2013) ("Factual disputes relating to whether a prisoner's failure to exhaust should be excused can generally be resolved by the court, and do not

15

ordinarily present a jury question."), *report and recommendation adopted*, No. 10 Civ. 5152 (CS) (PED), 2013 WL 1155354 (S.D.N.Y. Mar. 21, 2013).

## B. Plaintiff's Deliberate-Indifference Claim Was Not Exhausted

### 1. An Administrative Remedy Was "Officially on the Books"

In its March 2016 Opinion, the Court found that "Plaintiff's claims that Rikers Island staff members were deliberately indifferent to his medical needs ... were covered by the Rikers Island grievance procedure." *Galberth*, 2016 WL 1255738, at *6. This is the law of the case. Because Plaintiff has not indicated that "cogent and compelling reasons militate otherwise," nor disputed the procedure's applicability to his claims (*see* Def. Reply 56.1 ¶¶ 3-7), the Court will adhere to its prior decision. *Johnson* v. *Holder*, 564 F.3d 95, 99 (2d Cir. 2009) (internal quotation marks omitted) (quoting *United States* v. *Quintieri*, 306 F.3d 1217, 1225 (2d Cir. 2002)). The Rikers Island grievance procedure applied to Plaintiff's deliberate-indifference claim against Defendant.

### 2. The Administrative Remedy Was "Available" to Plaintiff

Plaintiff does not dispute the fact of his noncompliance with the Rikers Island grievance procedure; the parties agree that Plaintiff failed to grieve as the procedure required. (Def. 56.1 ¶ 10; AC 4.) But Plaintiff disputes the implications of that failure. Plaintiff argues that his mental illness and lack of awareness regarding the grievance procedure rendered the procedure unavailable, such that (i) Plaintiff was not required by the PLRA to exhaust his claims, and (ii) his failure to exhaust does not bar his deliberate-indifference claim.

In making this argument, Plaintiff does not directly invoke any one of *Ross*'s three unavailability examples. Plaintiff does not allege, for example, that the applicable grievance procedure "operate[d] as a simple dead end — with officers unable or consistently unwilling to provide any relief to aggrieved inmates" or was "so opaque" as to be "practically speaking, incapable of use." *See Ross*, 136 S. Ct. at 1859. Nor does Plaintiff indicate that "prison administrators thwart[ed] inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id.* at 1860.

Plaintiff's argument is rather a variation on *Ross*'s themes. Plaintiff does not critique the opacity of the Rikers Island grievance procedure in the abstract, but argues that the grievance procedure was "so opaque" as to be "practically speaking, incapable of use" *with regard to Plaintiff specifically*, because of Plaintiff's mental health condition in April 2011. (*See generally* AC; Oliner Decl., Ex. L, 22-26; Pl. Br. 15, 21-22; Pl. Supp'l Opp. 9, 11, 13, 33). Moreover, Plaintiff argues that the procedure was unavailable because Plaintiff was unaware of it, not having been directed to utilize the procedure nor having been given a copy of the Inmate Handbook. (Pl. Supp'l Opp. 10-11, 24; Def. Reply 56.1 ¶ 8). In the remainder of this Opinion, the Court will explain why these arguments fail.

### a. The Grievance Procedure Was Not Unavailable Because of Plaintiff's Mental Illness

The *Ross* Court did not opine on the specific question at the heart of this case: whether an inmate's mental health condition can cause administrative-remedy unavailability. Nor is this Court aware of any court that has

considered this precise question in light of *Ross*'s clarification of PLRA availability.  But even assuming *arguendo* that an inmate's mental health condition *can* cause administrative-remedy unavailability, the Court finds that Plaintiff has not introduced evidence sufficient to indicate that *his* mental health condition did so in this case.

### i.     Plaintiff's Evidence Is Insufficient to Permit a Jury Reasonably to Find in His Favor

The Court agrees with Defendant that much of Plaintiff's disagreement with his medical records seems to result from a misunderstanding of them. Plaintiff "appears to erroneously conflate long-term diagnoses with omnipresent psychosis."  (Def. Reply 3-4 (citing Pl. Opp. 10-28)).  Throughout his briefing, Plaintiff emphasizes the longstanding nature of his mental health condition, and his physicians' documentation of his self-reported perceptual problems. And this the Court entirely credits.  Plaintiff's medical records lay plain the fact that Plaintiff has long struggled with a host of mental health problems, and that Plaintiff felt paranoid, afraid, depressed, and anxious during his stay at Rikers Island.  But the Court also concurs with Defendant's assessment that "[n]othing in Plaintiff's Opposition addresses the undisputed facts that — despite any mental illness — [P]laintiff both described and sought assistance with non-psychiatric issues of concern to him (e.g., missed medication, lower back pain with a pre-existing condition and surgery, dry skin, and a rash) on at least four separate occasions while at Rikers in 2011 (April 4, 13, 15, and 18, 2011)."  (Def. Reply 4).  And "if plaintiff was lucid enough to describe and seek assistance with lower back pain — and provide the relevant history of that

condition — he was similarly capable of — *at the very least* — seeking assistance with the grievance system as described in the Inmate Handbook." (*Id.* (emphasis in original) (citing Def. 56.1 ¶ 9)).

The Court agrees that even if Plaintiff's symptoms were as severe as he represents that they were, the evidence does not support a conclusion that they were so severe as to render unavailable, at every moment, the Rikers Island grievance procedure. Nor that they were so severe that Plaintiff could not at any point seek an extension of the 10-day submission time permitted by that procedure. Rather, the evidence indicates that Plaintiff experienced many moments of lucidity in which he was able to recount his medical history and medication needs and to participate intelligently in judicial proceedings. Plaintiff's habit of selective record citation — highlighting portions that he believes to be favorable, while omitting mention of portions that contradict his account of his condition — does him no favors in this regard. "[T]his Court has conducted an assiduous review of the record to determine if there is any evidentiary support for [Plaintiff's] assertions of fact that do not cite to evidence and to determine if there are any other material issues of fact." *Betts* v. *Rodriquez*, No. 15 Civ. 3836 (JPO), 2017 WL 2124443, at *1 n.1 (S.D.N.Y. May 15, 2017) (internal quotation marks omitted) (quoting *Geldzahler* v. *N.Y. Med. Coll.*, 746 F. Supp. 2d 618, 620 n.1 (S.D.N.Y. 2010)). And the Court has found that the portions of the record with which Plaintiff takes issue are largely those portions in which Plaintiff himself told his treating physicians that he was *not* experiencing delusional thinking, perceptual distortions, or

hallucinations. Plaintiff has not accounted for the discrepancy between what he reported then and what he reports now. Thus, there is no evidence on which a jury could reasonably conclude that Plaintiff's mental health conditions rendered the Rikers Island grievance procedure unavailable. The procedure was "capable of use" by Plaintiff. *Ross*, 136 S. Ct. at 1859.

Indeed, even the records that Plaintiff does not dispute do not support a finding of unavailability. For example, Plaintiff accepts the accuracy of Dr. Kaye's records, and commends them to the Court's attention. (*See* Pl. Br. 7-8; Pl. Supp'l Opp. 18-20, 25). The Court agrees with Plaintiff that the records state that Plaintiff evidenced delusional thinking insofar as he felt suspicious of correctional officers. (Oliner Decl., Ex. H, at Def. 39). But the Court notes that the records also indicate that when he met with Dr. Kaye, Plaintiff was alert and aware, spoke normally, concentrated adequately, and evinced goal-directed and organized thought processes. (*Id.* at Def. 40). Plaintiff was not experiencing perceptual or auditory hallucinations. (*Id.* at Def. 40-41). Dr. Kaye diagnosed Plaintiff with depression, anxiety, and mood swings. (*Id.* at Def. 41). And Dr. Kaye affirmed expressly that Plaintiff was "not psychotic [and] not suicidal." (*Id.* at Def. 98).

The Court finds therefore that Plaintiff has not proven that his mental health condition caused the otherwise-available Rikers Island grievance procedure to become unavailable. After *Ross*, for such an argument to succeed — if even it can — a plaintiff must show more than Plaintiff has in this case.

### ii. Plaintiff's Argument May Fail Even With Sufficient Evidentiary Support

Thus, the Court does not need to determine the precise showing that *Ross* might require in order to resolve Defendant's motion. However, Plaintiff's argument raises an interesting question regarding the scope of availability post-*Ross* that the Court pauses here to consider: To what extent might a category of "special circumstances" survive *Ross*, insofar as they are also cognizable as circumstances determinative of availability?

Prior to *Ross*, courts in this Circuit utilized a three-part framework established in *Hemphill* v. *New York*, 380 F.3d 680 (2d Cir. 2004), to determine whether the failure of an inmate to grieve a claim covered by a prison grievance procedure could be excused. *Id.* at 686. Under this framework, considered as separate inquiries were the determinations (i) whether the grievance procedure was "in fact 'available' to the prisoner" *id.* (quoting *Abney* v. *McGinnis*, 380 F.3d 663, 667 (2d Cir. 2004)), and (ii) "whether 'special circumstances' have been plausibly alleged that justify 'the prisoner's failure to comply with administrative procedural requirements'" *id.* (quoting *Giano*, 380 F.3d at 676). The first of these was an inquiry into the fact of availability: Did the prison provide an administrative grievance procedure to inmates, both formally and in practice? This inquiry was outward-facing, concerned with what a prison had made available to its inmates. And the second inquiry — typically considered as the third prong of the tripartite *Hemphill* framework — was more-inward facing: Were there "special circumstances" relating to an inmate's knowledge of or experience with a grievance procedure that excused his failure to utilize it?

21

A court might consider, for example, whether the inmate had made a "reasonable mistake about the meaning of a prison's grievance procedures." *Ross*, 136 S. Ct. at 1858. This inquiry was concerned with what an inmate believed or knew to be available, separate and apart from what was factually available. But both inquiries were to be analyzed objectively, by comparison to "a similarly situated individual of ordinary firmness." *Hemphill*, 380 F.3d at 688 (availability); *see also id.* at 690 (special circumstances).

In *Giano* v. *Goord*, 380 F.3d 670 (2d Cir. 2004), the Second Circuit took note of the imprecision with which courts had considered these separate questions. The Circuit observed

> that the case law on the PLRA's exhaustion requirement does not always distinguish clearly between [i] cases in which defendants are estopped from asserting non-exhaustion as an affirmative defense, [ii] situations in which administrative remedies are not "available" to the plaintiff, and [iii] circumstances in which administrative remedies are "available," but the prisoner's original failure to exhaust is nonetheless justified, and hence does not bar the prisoner's subsequent suit.

*Id.* at 677 n.6. But the Circuit did not endeavor to explain the differences between these categories. *Id.* Instead, it simply speculated that the blurriness between them might exist "because the same facts sometimes fit into more than one of these categories." *Id.*

In *Ross*, the Supreme Court rejected the possibility of multiple, overlapping categories. The Supreme Court expressly and definitively abrogated *Giano* and its recognition of a category of "special circumstances" that could overlap with and enlarge the concept of "availability." The Court

22

made clear that the only exception to the PLRA's exhaustion requirement is the statute's textual, outward-looking "availability" exception, which requires a court to determine only whether grievance procedures existed that were "'capable of use' to obtain 'some relief for the action complained of.'" *Ross*, 136 S. Ct. at 1859 (quoting *Booth*, 532 U.S. at 738). Courts adjudicating PLRA exhaustion were no longer permitted to "look to all the particulars of a case to decide whether to excuse a failure to exhaust available remedies." *Ross*, 136 S. Ct. at 1858. After *Ross,* "such wide-ranging discretion 'is now a thing of the past.'" *Id.* (quoting *Booth*, 532 U.S. at 739).

While the *Ross* Court rejected the concept of multiple, separate categories, it did not address directly the overlap issue recognized by the Second Circuit. Nonetheless, this Court believes it reasonable to conclude that *Ross* precludes the inward-looking inquiry previously cognizable under *Hemphill*'s "special circumstances" prong. In *Ross*, the Supreme Court rejected the concept of "special circumstances," in no uncertain terms, barring courts from considering the "particulars of a case." *Ross*, 136 S. Ct. at 1858. And the Court proffered a trio of unavailability examples all concerned with what remedies a prison made available to a reasonable prisoner, formally and in practice. *See Ross*, 136 S. Ct. at 1859-60. In other words, the Court seems to have affirmed the outward-looking inquiry focused on what is made available by a prison, and rejected the inward-looking inquiry concerned with is perceived to be available by a prisoner.

This Court is not aware of any cases post-*Ross* to have reached this conclusion, or to have found to the contrary that a prisoner's failure to exhaust was excused because that prisoner's mental health condition rendered unavailable otherwise-available administrative remedies. But the post-*Ross* case law appears to indicate that the latter argument would not succeed. Where courts have been presented with inward-looking justifications for a failure to exhaust, which are based in a prisoner's subjective sense of what was available, such justifications have been rejected. *See Little* v. *Mun. Corp., City of N.Y.*, No. 12 Civ. 5851 (KMK), 2017 WL 1184326, at *12 (S.D.N.Y. Mar. 29, 2017) (holding that plaintiff's "allegations of generalized fear are insufficient to excuse his failure to exhaust"); *Millner* v. *Biter*, No. 13 Civ. 2029 (AWI) (SAB) (PC), 2017 WL 735688, at *7 (E.D. Cal. Feb. 24, 2017) ("While [p]laintiff's pain and/or mental distress may have made the grievance process more challenging, it was not out of reach to [p]laintiff so as to be rendered 'unavailable' through no fault of his own."); *Aviles* v. *Tucker*, No. 14 Civ. 8636 (NSR), 2016 WL 4619120, at *4 (S.D.N.Y. Sept. 1, 2016) (conclusory allegations that plaintiff was afraid to file a grievance "cannot support a finding that the grievance process was unavailable"); *Whitley* v. *Tourtelot*, No. 15 Civ. 377 (GTS) (TWD), 2016 WL 4530740, at *5 (N.D.N.Y. Aug. 3, 2016) (rejecting plaintiff's argument that "his mental state could be construed as a special circumstance which justified his failure to exhaust administrative remedies ... because the Supreme Court has squarely rejected the 'special circumstances' exception to administrative exhaustion"), *report and recommendation adopted*, No. 15 Civ.

377 (GTS) (TWD), 2016 WL 4532150 (N.D.N.Y. Aug. 29, 2016); *Briscoe* v.

*D'Agata*, No. 14 Civ. 7384 (KMK), 2016 WL 3582121, at *7 (S.D.N.Y. June 28,

2016) (finding jail's grievance procedure was "available" despite plaintiff's

assertion that he did not know about it, because "[t]he availability of

administrative remedies is adjudged not by whether the [p]laintiff was unaware

of them, but instead by whether 'a similarly situated individual of ordinary

firmness' would have deemed them available" (quoting *Hemphill*, 380 F.3d at

688)).

Ultimately, this issue is not dispositive here. For the reasons the Court

explained in the prior section of this Opinion, the Court believes that the Rikers

Island grievance procedure was available to Plaintiff in April 2011. But the

Court has considered this issue at length here because of its far-reaching

consequences for the mentally ill prison population. If *Ross* precludes

consideration of a prisoner's subjective sense of availability, the Court fears

there may be situations in which a mentally ill prisoner is unable to satisfy the

PLRA's exhaustion requirement. To be clear: The Court does not here hold

that mental illness, and treatment occasioned as a result thereof, could *never*

render an otherwise available grievance procedure unavailable for purposes of

PLRA exhaustion under *Ross*. But the Court does believe that there is a

tension between (i) the *Ross* Court's definition of availability and rejection of

special-circumstance consideration and (ii) the question of administrative-

procedure availability with regard to mentally ill inmates that merits attention.

### b. The Grievance Procedure Was Not "Unavailable" Simply Because Plaintiff May Have Been Unaware of It

In *dicta* prior to *Ross*, the Second Circuit intimated that an inmate may be able to demonstrate that grievance procedures were unavailable to him because "he was not timely provided an inmate handbook" and therefore "was unaware of the grievance procedures contained within it or ... did not understand those procedures." *Ruggiero* v. *Cty. of Orange*, 467 F.3d 170, 178 (2d Cir. 2006). In the wake of this suggestion, district courts considered the fact of an inmate's awareness when adjudicating availability for purposes of PLRA exhaustion. *See, e.g.*, *Angulo* v. *Nassau Cty.*, 89 F. Supp. 3d 541, 552-53 (E.D.N.Y. 2015) (finding plaintiff had not shown grievance procedure was not "available" because, among other things, plaintiff had not shown that he was unware of it); *Abdallah* v. *Ragner*, No. 12 Civ. 8840 (JPO), 2013 WL 7118083, at *3 (S.D.N.Y. Nov. 22, 2013) ("An administrative remedy is not 'available' for purposes of the PLRA if prisoners are not informed that the remedy exists."); *Walker* v. *Vargas*, No. 11 Civ. 9034 (ER), 2013 WL 4792765, at *5 (S.D.N.Y. Aug. 26, 2013) (same).

The Supreme Court's holding in *Ross* curtailed significantly the availability inquiry. Though the Court believes *Ruggiero* remains good law, it also believes that the showing *Ruggiero* requires to satisfy availability is heightened in *Ross*'s wake. A plaintiff post-*Ross* must show more than mere unawareness of an existing grievance procedure; a plaintiff must show that he was unaware *because*, for example, officers were unable or unwilling to make him aware, or prevented him from becoming aware "through machination,

misrepresentation, or intimidation." *See Ross*, 136 S. Ct. at 1859-60; *see also Briscoe*, 2016 WL 3582121, at *7 ("The availability of administrative remedies is adjudged not by whether the [p]laintiff was unaware of them, but instead by whether 'a similarly situated individual of ordinary firmness' would have deemed them available." (quoting *Hemphill*, 380 F.3d at 688)).  In other words: A plaintiff must show "that other factors — for example, threats from correction officers — rendered a nominally available procedure unavailable as a matter of fact." *Briscoe*, 2016 WL 3582121, at *7 (internal quotation mark omitted) (quoting *Hubbs*, 788 F.3d at 59).

In this case then, Plaintiff would have to demonstrate that he was not timely provided with an inmate handbook because corrections officers were unwilling or unable to provide him with one, or prevented him from accessing the handbook "through machination, misrepresentation, or intimidation." *Ross*, 136 S. Ct. at 1859-60.  Plaintiff has not done so.  Thus, even if the parties dispute Plaintiff's possession of the handbook, this dispute is not material.  Whether or not Plaintiff actually possessed the handbook, he nowhere claims that the failure to provide him with the handbook rendered the grievance procedures described therein incapable of use; that Plaintiff sought and was unable to obtain a handbook for some reason; or that Plaintiff was deprived of the handbook purposefully, as "through machination, misrepresentation, or intimidation." *See Ross*, 136 S. Ct. at 1860.  Indeed, Plaintiff has never deviated from his stance that it was "[d]ue to mental illness," and mental illness alone, "[that Plaintiff] did not file a grievance complaint."

(Pl. Supp'l Opp. 11). The parties' dispute regarding Plaintiff's possession of the inmate handbook is accordingly not material, and does not prevent the Court from entering summary judgment for Defendant.

## CONCLUSION

For the reasons outlined above, Defendant's motion for summary judgment is GRANTED. The Clerk of Court is directed to terminate all pending motions, adjourn all remaining dates, and close this case.

SO ORDERED.

Dated:     July 31, 2017
           New York, New York

_____
KATHERINE POLK FAILLA
United States District Judge

*A copy of this Order was mailed by Chambers to:*

Gregory Galberth
03A0661
Marcy Correctional Facility
Box 3600
Marcy, NY 13403-3600